Disciplinary Board v. Anseth, 1997 ND 66, 562 N.W.2d 385|N.D. Supreme Court|
Disciplinary Board v. Anseth, 1997 ND 66, 562 N.W.2d 385
[Go to Documents]
Filed Apr. 22, 1997
IN THE SUPREME COURT
STATE OF NORTH DAKOTA
1997 ND 66
In the Matter of the Application for Disciplinary Action Against Leroy P. Anseth
a Member of the Bar of the State of North Dakota
Civil No. 960297
Application for disciplinary action.
PUBLIC REPRIMAND ORDERED.
Per Curiam.
Vivian E. Berg (argued), Disciplinary Counsel, P.O. Box 2297, Bismarck, ND 58502-2297.
Anseth Johnson Law Firm, 417-1st Avenue East, P.O. Box 2536, Williston, ND 58802-2536, for respondent; argued by LaRay Anseth Johnson. Appearance by LeRoy P. Anseth.
Matter of Application for Disciplinary Action Against LeRoy P. Anseth
Civil No. 960297
Per Curiam.
[¶1] Disciplinary Counsel objects to the Disciplinary Board's dismissal of a formal disciplinary case against LeRoy P. Anseth. We exercise our inherent power to discipline, and we publicly reprimand Anseth.
I. Background
[¶2] Together, Anseth and Janet Zander practiced law in Williston. They contracted with the Williston Regional Child Support Enforcement Unit (RCSEU) to review, sign and file documents prepared by RCSEU staff, and to prepare and file more complicated documents for child-support enforcement. Zander did most of this work for the firm.
[¶3] On March 28, 1994, Zander, who was only an employee, told Anseth she was quitting. On April 4, RCSEU notified Anseth it would terminate his contract effective May 4, and would award a new contract to Zander. RCSEU later extended Anseth's contract to July 31, 1994, so he could complete his files, but it did not assign any new cases to him.
[¶4] Anseth continued work for RCSEU through July 31. Soon after that, he put nearly twenty-five full boxes of former RCSEU files into off-site storage. However, six files, lettered cases A through F for identification, became the subject of this disciplinary complaint.
[¶5] Before September 1, Elaine Peterson, an RCSEU secretary, called Anseth about case A, and asked him to file original documents. Anseth wrote back: "On July 28, 1994 I received a letter from Michon Sax which directed me to cease legal services on July 31, 1994. I would like to inform you that the letter specifically stated I was to cease doing anything on the case." Anseth never returned or filed the originals, and RCSEU had to file photocopies with the clerk of court after getting permission from the court. The same thing happened with case C, only RCSEU could not file photocopies and had to start over by serving the summons and complaint a second time.
[¶6] Peterson also contacted Anseth about case B, again asking him to file original documents thought to be in his office. On August 24, Charles Neff, the opposing attorney in case B, wrote Anseth notifying him original pleadings needed to be filed or he would move to dismiss. Replying to Neff on August 30, Anseth wrote that he checked the clerk's file for the originals and they had been filed. Anseth copied this letter to Zander. However, Anseth did not tell Peterson the originals had been filed, but merely repeated that he no longer worked for RCSEU.
[¶7] RCSEU believed case D also lacked original documents, but it did not contact Anseth about that case. Administrator Barbara Johnson said RCSEU did not do so because a "pattern had been set and it appeared the documents were not being filed and we were trying to get these files completed with whatever means that we could." Later, RCSEU obtained an order permitting them to file photocopies with the clerk of court. Still later, it discovered the original pleadings had been filed already.
[¶8] Administrator Johnson contacted the State's Attorney about Anseth, and he advised her RCSEU's options were to file a complaint with the Disciplinary Board, get a court order, or just try to finish the cases. The governing board for RCSEU met to discuss the situation, and decided to try to work with Anseth instead of filing a disciplinary complaint. Michon Sax, Social Services Director for Williams and McKenzie County, testified the board wanted to maintain a relationship with Anseth because they still planned to work with him as a guardian ad litem and attorney for indigent clients. Sax hoped all along the Anseth situation was a "nightmare that would go away."
[¶9] On September 12, before cases A,B,C, and D were completed, Sax wrote Anseth requesting the "original court documents." Anseth replied by letter on September 15:
I thank you for your letter of September 12, 1994. I would like you to look at your letter to me of July 28, 1994 when you indicated you had terminated the contract to provide legal services for the Williston Regional Child Support Enforcement Unit effective July 31, 1994 and in that letter you went on to specifically add that it was no longer my obligation to provide legal services and that those services would cease July 31, 1994. Those are your words and not mine. Attached to that letter of July 28, 1994 were specific lists of cases I was to ceasehaving any further obligations to.
In your letter of September 12, 1994 you refer to Williams County, a former client. You are now requesting some documents. I am enclosing for you a copy of a plaque which many lawyers have hanging in their office and a quote by Abe Lincoln that says, "A lawyer's time and advice are his stock in trade". I am assuming by your reference that you are a former client and that you have no intention of paying for my time to locate things in my file which are now in storage. If you wish to hire me at my regular billing rate as there is no longer a contract in force I would be most happy to work for you.
Sax did not respond to Anseth's letter because RCSEU was not willing to pay again for work he had been paid to do.
[¶10] For case E, Anseth had prepared an order and filed it with the court, but the court clerk had returned it for corrections. Anseth never filed a corrected order, and RCSEU had to buy a trial transcript to enable Zander to do it. Anseth admits this order "may have fallen through the cracks." [¶11] Case F had been heard on July 25, 1994, four working days before Anseth's contract ended. Anseth failed to prepare the necessary order for it. RCSEU bought a transcript to enable Zander to prepare it. Johnson testified that Anseth was to have prepared the order. Anseth testified that the order was to have been prepared by RCSEU staff, so the staff would have sent the order to Zander if it was completed after July 31. He also testified that four days was not a typical turnaround to prepare an order. The fact that Zander, and not RCSEU staff, eventually prepared the order supports Johnson's testimony. We find Anseth took the notes at the July 25 hearing on case F to prepare an order, had time to complete the order, and failed to do so without notifying his client.
[¶12] John Cecil, a party to case F, frequently asked Craig Burke, the RCSEU investigator, about the status of his case. Burke told Cecil he did not know what was happening on it, and he suggested Cecil call Anseth. Cecil called Anseth, and Anseth made a conference call with Cecil to Burke. When Burke found out Anseth was not representing either RCSEU or Cecil, he hung up on them. Anseth then contacted Burke's superior to inquire further. The superior told Anseth that RCSEU would get back to Cecil about the status of the case. The hearing body found on this incident: "The inquiry Anseth made with various Social Services employees and administrative personnel was professional and courteous." Disciplinary Counsel does not contest this finding. We conclude Anseth's inquiries about case F did not violate the Rules of Professional Conduct.
[¶13] Burke, the RCSEU investigator for some of these cases, eventually filed the complaint against Anseth with the Disciplinary Board. An inquiry committee recommended a formal disciplinary petition. The hearing body found Anseth's conduct "did not violate any Rules of Professional Conduct or any other professional rules, requiring discipline," and recommended dismissal. Without oral arguments or briefs, the Disciplinary Board adopted the findings and recommendations of the hearing body and dismissed the disciplinary action. Disciplinary Counsel filed objections to that order of dismissal with this court.
II. Objections
[¶14] This is the first time Disciplinary Counsel has objected to a Disciplinary Board's dismissal. We must decide whether her objection calls for our review.
[¶15] Disciplinary Counsel argues she is entitled to object under NDRLD 3.1(G). Alternatively, under our reserved powers in NDRLD 3.1(H), she contends we should exercise our inherent authority to discipline.
[¶16] Generally, the parties to a disciplinary action can object to a Disciplinary Board decision:
Review by the Court. The board shall promptly submit to the court a report containing its findings and recommendations on each matter heard other than those resulting in remand, dismissal without appeal, consent probation without appeal, or reprimand without appeal. . . . A copy of the report submitted to the court must be served upon counsel, complainant, and the lawyer. Within 20 days of service of the report, the lawyer and counsel may file objections to the report.
NDRLD 3.1(G). Here, the Disciplinary Board dismissed the action against Anseth and did not file a report with this Court. Disciplinary Counsel, however, argues that this disposition can be appealed when she objects. Thus, she argues, "an appeal was made and this matter is appropriately before the Court under Rule 3.1(G)." Because we choose to use our inherent disciplinary power in this case, we do not decide whether Disciplinary Counsel properly appealed this dismissal.
[¶17] Even if NDRLD 3.1(G) may not apply, Disciplinary Counsel urges this court to review the actions of the Disciplinary Board under our inherent authority to discipline lawyers reserved in NDRLD 3.1(H). Disciplinary Counsel submits this case is serious enough for use of that inherent power. We agree.
[¶18] This Court has a duty to maintain the integrity of the legal profession by disciplining lawyers. Matter of Lovell, 292 N.W.2d 76, 82 (N.D. 1980). To that end, we have reserved the power to discipline lawyers on our own initiative: "Nothing in these rules prevents the court from instituting disability or disciplinary proceedings on its own initiative." NDRLD 3.1(H). As this Court explained long ago:
The power to discipline attorneys, who are officers of the court, is an inherent and incidental power in courts of record, and one which is essential to an orderly discharge of judicial functions.
In re Simpson, 83 N.W. 541, 553 (N.D. 1900). We conclude this case calls for us to exercise our "inherent and incidental power."
III. Misconduct
[¶19] Disciplinary Counsel objects to the hearing body's decision that Anseth did not breach the Rules of Professional Conduct. She argues RCSEU did not have to hire Anseth again to retrieve its own documents from his files, and did not have to pay to get Anseth to comply with ethical standards. She asserts that Anseth failed to respond helpfully or meaningfully to RCSEU's requests, and contends he was obligated to minimize any harm that ending his representation would cause his client. Disciplinary Counsel asserts RCSEU had a "vital" right to discharge an attorney without having to pay two attorneys for the same services. Disciplinary Counsel submits that Anseth's actions did not reasonably protect RCSEU's interests and that his conduct reflects badly on the legal profession.
[¶20] We review disciplinary actions against attorneys anew under a clear and convincing standard of proof. Disciplinary Bd. of Supreme Court v. McKennett, 349 N.W.2d 29, 31 (N.D. 1984). Although we give due weight to the findings, conclusions and recommendations of the Disciplinary Board, we do not automatically accept those findings; we decide each case on its own facts. Disciplinary Bd. v. Gray, 544 N.W.2d 168, 171 (N.D. 1996); Disciplinary Action Against Britton, 484 N.W.2d 110, 111 (N.D. 1992). Here, we conclude Anseth clearly violated duties to RCSEU upon termination of his services.
[¶21] Anseth's ethical duties to RCSEU, as a governmental entity, were the same as to an individual client. See NDRPC 1.18 cmt. Anseth's obligations were clear:
Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.
NDRPC 1.16(e) (emphasis supplied). Anseth was obligated to surrender the original documents for cases A, B, C, and D. Anseth was obligated to take "steps to the extent reasonably practicable to protect [RCSEU's] interests" on cases E and F by, at least, completing work undertaken within the allotted time or informing his client clearly about their incomplete status.
[¶22] We are not concerned with cases B and D because Anseth no longer had those originals. Although Anseth should have been more informative in his replies to RCSEU's inquiries, he was not obligated to return documents he no longer had.
[¶23] For cases A and C, though, Anseth had a clear duty to turn the originals over to RCSEU. "The lawyer who has withdrawn or has been discharged by the client has a duty to surrender promptly all papers and other property to which the client is entitled." Annotated Model Rules of Professional Conduct Rule 1.16(d) annot. at 256 (3d ed. 1996); see also Matter of Lyles, 477 S.E.2d 105, 106-07 (Ga. 1996)(suspending attorney in part for failure to return requested client documents); In re McCarty, 665 A.2d 885, 887 (Vt. 1995)(publicly reprimanding attorney for failing to return client property after termination of representation). While Anseth did not have to bear the cost of returning the documents, he should have made them readily available for RCSEU personnel to pick up. See Illinois State Bar Ass'n, Comm. on Prof'l Ethics, Op. 94-14 (1995)("All original papers delivered to the lawyer by the client must be returned to the client."); Maine State Bar Ass'n, Prof'l Ethics Comm'n, Op. 120 (1991)(requiring attorney to make papers available to client, but not requiring attorney to bear delivery costs). Anseth should have done more to return RCSEU's documents.
[¶24] Unfortunately, both the Disciplinary Board and the hearing body ignored case E and did not make any findings about it. Anseth's inaction on case E is not acceptable; that it "may have fallen through the cracks" is not a valid excuse. His inattention was negligent, at least.
[¶25] We do not believe Anseth actually had to prepare the case E order after July 31. SeeNDRPC 1.16(e) cmt. ("Whether or not a lawyer for an organization may under certain unusual circumstances have a legal obligation to the organization after withdrawing or being discharged . . . is beyond the scope of these Rules.") However, before the end of his representation, he should have adequately informed RCSEU about the incomplete status of that case. See NDRPC 1.4 (requiring attorneys to keep clients reasonably informed about status of matter); In re Ambrose, 442 N.E.2d 900, 902 (Ill. 1982)(reprimanding attorney in part for failure to inform client about incomplete status of case upon withdrawal of representation); Disciplinary Bd. v. Robb, 506 N.W.2d 714 (N.D. 1993)(publicly reprimanding attorney for failure to keep client reasonably informed about status of bankruptcy matter).
[¶26] We reach the same conclusion for case F. As we explained in Disciplinary Bd. v. Amundson, 297 N.W.2d 433, 443-44 (N.D. 1980): "Public trust in the legal profession is a necessity and as a consequence lawyers traditionally have been held to a higher standard." By failing to protect RCSEU's interests on cases E and F, Anseth breached his obligation to "take steps to the extent reasonably practicable to protect a client's interests."
[¶27] Anseth blames RCSEU for a lack of communication on these six cases. Anseth says he promptly responded to RCSEU's requests for documents, but RCSEU did not contact him again. On the prepared documents, he points out that RCSEU did not follow its usual practice of checking an order's status. We are not persuaded because RCSEU tried several times to communicate its needs to Anseth, but was met each time with his stubborn and uninformative refusal to cooperate in any way without being paid. Anseth, not RCSEU, had the affirmative duty to "take steps to the extent reasonably practicable to protect a client's interests."
IV. Sanction
[¶28] Disciplinary Counsel urges the most appropriate sanction for Anseth's misconduct is a short period of suspension followed by probation. She contends that "Anseth knowingly engaged in conduct that violated his duty to the client upon termination of his employment, with serious or potentially serious injury to the client, the public, and the legal system." She suggests disbarment might even be appropriate, if we found Anseth intended to enrich himself by seeking payment for simply returning the client's own documents. Disciplinary Counsel urges more than a reprimand is needed because Anseth's misconduct was affirmative and deliberate, not merely negligent.
[¶29] To formulate a suitable sanction for a lawyer's misconduct, we consider: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the extent of actual or potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. Disciplinary Action Against LaQua, 548 N.W.2d 372, 374 (N.D. 1996); NDSILS 3.0. The range of sanctions for Anseth's misconduct is suggested in North Dakota Standard for Imposing Lawyer Sanctions 7.0:
Violations of Duties Owed to the Profession
Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving . . . improper withdrawal from representation . . . .
7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.
7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system.
7.3 Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system.
7.4 Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether the lawyer's conduct violates a duty owed to the profession, and causes little or no actual or potential injury to a client, the public, or the legal system.
Generally, disbarment and suspension are the appropriate sanctions for knowing misconduct, and reprimand and admonition are appropriate for negligent misconduct.
[¶30] Here, suspension would ordinarily be appropriate for Anseth's knowing failure to fulfill his obligations to RCSEU. However, we find his misconduct is mitigated by his cooperation with the Disciplinary Board and the absence of any prior disciplinary record. SeeNDSILS 9.32(a) and (e). Disciplinary Counsel argues that Anseth's failure to admit the seriousness of his conduct is an aggravating factor that warrants a stiffer sanction. Yet, Anseth grudgingly conceded one file had "fallen through the cracks." On the whole, we conclude that Anseth's failure to understand the seriousness of his misconduct is also largely balanced by the mitigating factors, and that the most appropriate sanction for Anseth is a public reprimand.
[¶31] We direct that LeRoy P. Anseth be publicly reprimanded for his misconduct, and that Anseth pay the costs of this disciplinary proceeding to be determined by the Disciplinary Board.
[¶32]
Gerald W. VandeWalle, C.J.
Herbert L. Meschke
Dale V. Sandstrom
William A. Neumann
Mary Muehlen Maring